## WITT v. UNITED STATES.

### No. A–17583.

United States District Court
E. D. New York.
March 2, 1949.

of a gang of four subordinates shifting ship's stores from one storeroom to another on the lower deck; these were packages and cases which were placed on a 5-foot platform, and removed therefrom by the other hands, one of whom is said to have been Swenson, 2nd cook.

There was one door, dimensions not given, used for ingress and egress in connection with this work, which had been hooked open but was said later to have been unhooked. The platform was 10 feet by 12 feet and the room itself was 24 feet by 36 feet, and was lighted.

The happening is thus described by libellant:

"I was just handing down the last case and I am stepping down from the platform, the door moved slightly forward to me and then hit my left hip on the door knob, on that iron door. * * *

"There was a slight movement of the ship; otherwise the door would have stayed in the same position without the hook on. * * *

"I was stepping down from the platform at the time figuring that the door would be on the hook, but the door was actually off the hook and approximately maybe two inches toward me when I went down (off?) the platform."

Asked if he saw any part of the door open as he looked toward the passageway outside, he said: "No." Asked if he looked, he said:

"I did look—no, I did not look at the door—well, I couldn't avoid looking at the door stepping down from the platform, being that the door was so close to the passageway, but I could not see at the time how far the open door was or how wide open it was."

He said that the platform was from 3 to 4 feet from the door which opened inwardly; that it was his duty to direct the men under him and to see to it that the door was hooked open while all hands were moving through the doorway in performing the task at hand.

Something will be said presently about Swenson, the second cook, upon whom libellant seemingly relies to establish that he

Richard M. Cantor, of New York City (Louis Dubow, of New York City, of counsel), for libellant.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Joseph K. Inness, of New York City, of counsel), for respondent.

BYERS, District Judge.

Two causes are pleaded in the libel; the first for damages for personal injury, the second for maintenance and cure. The first embraces alleged loss of wages as well as the usual incidents of bodily injury.

Libellant was told by the Port Steward of Moore-McCormack Lines, the operating agent of respondent, to report for duty as chief steward aboard the S.S. David L. Swain, then lying at Norfolk, Virginia. This was on November 18, 1943.

He so reported on the vessel, which was moored to her pier, on the following day, and performed customary duties until November 24, 1943, when he claims to have suffered the injury in question.

It seems that from about 6:00 P.M. and for one hour thereafter, he was in charge

was the one who unhooked the door, just prior to the contact with the knob. As to that, his testimony is:

"I went out the storeroom. * * *

"I was carrying a package * * *

"I used both hands to get the package, but then I was using one hand. * * *

"The only thing I think I left the latch (hook?) off, so I could get more room, to make a little more room for me, because there is a big paper bag you have got to go through the door with. * * *

"Q. Did you leave the latch (hook?) off or didn't you? A. I wouldn't swear to it, but I think I did, to make room for that paper package. * * * I did not put the latch (hook?) back. * * *

"Q. How could you make the door any more open than it was? A. I get it close to the shelves. (He indicated a 2½ foot package.)

"Q. Was it necessary to lift that latch or hasp, or whatever it was, in order that you should get through the door with a package that you were carrying? A. I do not know, your Honor, if it was necessary, but I think it was done for convenience. We always tried to get the packages through as fast as possible.

"Q. What I am trying to find out is: Was the package too big to go through the door as it was? A. No."

Since it is Swenson's act or omission which is relied upon to establish negligence, the equivocal nature of his testimony is obvious. If he did a necessary thing, it could scarcely be characterized as negligent; if the act of lifting the hook was calculated and deemed to be helpful, while not strictly necessary, I should suppose that to call it a tort would have dubious sanction.

He said he had not gotten back to the storeroom from which he removed the package, when he heard Witt complain: "The hook, it hurt me."

If it was not negligent for Swenson to unhook the door (I am not certain, any more than he is, that he did) and he had not yet returned to rehook it, then his failure to do the latter was of course not negli-

gent. The only omission that could be charged against him was failing to stop immediately outside the doorway and replace the hook, which would have required putting down his 2½ foot package, and then resuming its carriage.

In order so to characterize the latter omission, it would be necessary to reason that he owed that duty to any one who might be following him. Since they were all working in lighted quarters, it is not presently apparent that he was required to assume that any one tailing him would not use his eyes—least of all, the man who was in charge of the activity.

There is no credible evidence that the ship was rolling at her pier. The libellant's statement that she must have moved is an opinion, not the recital of an observed occurrence. Moreover, the storerooms were in the steadiest quarters of the ship.

This brings us to libellant Witt who looked through the door, but didn't see how far it was open, which is another way of saying that he didn't use his eyes. It is not unreasonable to require men to do that who have them to use. In other words, the negligence was his, and his alone, not that of the ship, namely, his fellow servant.

The fact that the libel was not filed until October 15, 1945, almost two years after November 23, 1943, may indicate an awareness of the true explanation of what occurred.

He says he reported the accident to the Purser that night, but the ship's log contains no entry to that effect. A chief steward must be deemed to understand the necessity for making a personal injury known to the master or a deck officer, and his failure so to do is significant. The ship's log indicates that, during the period between November 19th and 26th, on which latter day he left the ship temporarily ("I decided at night (25th) to go to New York over the weekend.") there was no dearth of ship's officers.

On the second day after reaching his home and while stepping out of his bath, he felt so much pain in his hip that he went to the Marine Hospital at Stapleton on the 29th and stayed there until January

1, 1944. The hospital record includes this entry:

"Diagnosis: Fracture, simple, greater trochanter, left femur. * * *

"Saturday night he stepped out of bath tub on to left foot, and noted immediate pain in left hip and disability of the extremity. Has had persistent pain in left hip, even at rest. * * * X-ray * * * There is evidence of an incomplete fracture of the greater trochanter of the femur, with good position of the fragments. * * * Disability: three weeks from date of discharge."

The foregoing will be seen to be devoid of any mention of the accident relied upon to sustain the libellant's cause.

He received out-patient care at the Hudson Street Hospital from February 17th to 24th, 1944, and upon admission the record shows that for the first time he claimed that his left hip was struck by an iron door on November 24, 1943, while he was working on a ship. "2/21/44: * * * Discharged no need of further treatment, fit for duty."

The libellant's accident must be deemed to have occurred, for the purposes of this case (although his wife made no mention of it on November 29th, when reporting in person to the Moore-McCormack Lines' claim agent that her husband was unable to rejoin the ship), but whether he struck the door because he was careless in the method of his egress from the storeroom, or whether the door struck him, is sufficiently in doubt to render it impossible for me to make an affirmative finding on that subject.

The testimony of Swenson is not persuasive, and his demeanor as a witness left much to be desired in respect of credibility and status.

Instead of saying frankly that he had come from New Bedford to testify as a person who was interested in having Witt's cause fully presented, he sought to give the impression that his presence in court was somewhat fortuitous.

His status is equivocal in that:

Witt says that he has a friend but not a brother-in-law, by the name of Henry Swenson (that being the name of the second cook).

"Q. And was he on board this ship at this time? A. No, he never was."

The witness Swenson's name is Adolph Emanuel Swenson. He had lived with the Witt's for five years—six years ago.

"Q. Are you related to Mr. Witt? A. That I am."

He signed articles on the Swain for a voyage starting in October of 1943, and gave the name and address of his next of kin as: "Sister, Margaret Witt". "I did it for the insurance thing. I have no family and I am single, and in case something happens she is going to get it."

Seemingly Witt was talking about this Swenson when he denied that he was on the ship.

The subject may be left where the testimony puts it.

The fact of injury must be deemed to have been shown (although it was of such a nature that it could easily have occurred after the trip to New York was begun) but not that it was caused by negligence on the part of the ship.

As to the libellant's claim for wages for the voyage which he intended to make, the undisputed fact is that he never signed articles, and since he did not rejoin the ship, he did not render the services which would be the basis of claim for wages, even though articles were not signed. Mahoon v. The Gloucester, 16 Fed.Cas. No.8,970.

Similar claims have been asserted and rejected: The Vestris, D.C., 252 F. 201; The Cliftwood, D.C., 280 F. 726.

The cause then is for maintenance and cure, and as to that the libellant is to be granted a decree covering the period of his discharge from the hospital at Stapleton, January 1, 1944, through February 24, 1944, the date of his final discharge as cured from the Hudson Street Hospital, at the rate established by the War-Shipping Administration for licensed personnel (p. 87) at $4.00 per day, namely, 55 days at that rate, or $220.00 with interest and costs.

Findings are filed herewith.

Settle decree.